IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

DAVID EUGENE BOWMAN                                                      PLAINTIFF

v.                                          CIVIL ACTION NO. $A2402-21-2$

THE MCDONNELL LAW FIRM, P.A.                                          DEFENDANTS
AND METLIFE LEGAL PLANS, INC.,
f/k/a HYATT LEGAL PLANS, INC.

### SUMMONS

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

TO:     MetLife Legal Plans, Inc. f/k/a Hyatt Legal Plans, Inc.
        Registered Agent:
        CT Corporation System
        4400 Easton Commons Way, Suite 12
        Columbus, Ohio 43219

### NOTICE TO DEFENDANT(S)

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND
YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

You are required to mail or hand-deliver a copy of a written response to the Complaint to:

E. Taylor Polk, attorney for Plaintiff whose address is Heilman Law Group, P.A., Meadowbrook

Office Park, 4266 Interstate 55 North, Suite 106, Jackson, Mississippi 39211.  Your response

must be mailed or delivered within thirty (30) days from the date of delivery of this Summons

and Complaint or a judgment by default will be entered against you for the money or other things

demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a

reasonable time afterward.

**EXHIBIT A**

ISSUED UNDER MY HAND AND SEAL OF SAID COURT, this 4th day of January, 2021.

CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI

By: _____
Deputy Clerk

FILED

JAN 0 4 2020

CONNIE LADNER
CIRCUIT CLERK

BY _____ D.C.

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

DAVID EUGENE BOWMAN                                      PLAINTIFF

v.                                      CIVIL ACTION NO. **A2402-21 - 2**

THE MCDONNELL LAW FIRM, P.A.                            DEFENDANTS
AND METLIFE LEGAL PLANS, INC.,
f/k/a HYATT LEGAL PLANS, INC.

### ORIGINAL COMPLAINT

COMES NOW David Eugene Bowman and presents his Original Complaint against the McDonnell Law Firm, P.A., and MetLife Legal Plans, Inc., f/k/a Hyatt Legal Plans, Inc., as follows:

### I.    PARTIES

1.1    David Eugene Bowman is an adult resident of Maricopa County, Arizona.

1.2    The McDonnell Law Firm, P.A., is a professional association registered to do business in Mississippi with its principal place of business at 1015 Howard Avenue, Biloxi, Mississippi, 39530. Process may be served upon the registered agent for the McDonnell Law Firm, P.A. – Mr. John G. McDonnell at 1015 Howard Avenue, Ste. B, Biloxi, Mississippi, 39530 or wherever he may be found.

1.3    MetLife Legal Plans, Inc. f/k/a Hyatt Legal Plans, Inc., is a corporation organized under the laws of Delaware with its principal place of business at 1111 Superior Avenue E 44114, Cleveland, Ohio. Process up on this Defendant may be served upon its registered agent, CT Corporation System, 4400 Easton Commons Way, Suite 124, Columbus, Ohio 43219 or otherwise in accordance with the Mississippi Rules of Civil Procedure.

### II.    VENUE AND JURISDICTION

2.1    The Court has subject matter jurisdiction over this case.

2.2     Venue is proper in this Court because a Defendant resides in Biloxi, Mississippi, within the Second Judicial District of Harrison County, Mississippi.

## III.     FACTS

3.1     Mr. Bowman was an employee of Meritor, Inc. One of the benefits offered to eligible employees of Meritor was a group legal services plan that provided pre-paid personal legal services. MetLife Legal Plans f/k/a Hyatt Legal Plans, Inc., (referred to herein as "Hyatt") a corporation whose headquarters is located in Cleveland, Ohio, administered the benefits of the plan. Under the plan, employees seeking legal services would be referred by Hyatt to designated participating law firms or plan attorneys who were employed by those firms. Mr. Bowman enrolled in the legal plan through his employer.

3.2     Hyatt represented to Mr. Bowman that enrollees in the legal plan have access to pre-qualified and experienced attorneys across the country fully capable of addressing his legal needs with competency and skill. Hyatt further represented that it would take immediate action to resolve any problems that Mr. Bowman had with Hyatt's legal plan attorneys and generally succeeded in resolving problems with its network attorneys within 24 to 48 hours. Hyatt provided Mr. Bowman with a phone number to the Client Service Center at 800-821-6400, if a legal matter arose.

3.3     Mr. Bowman and Pamela Robin Sills became engaged to be married, and Mr. Bowman called Hyatt about having an attorney draft an antenuptial agreement to protect premarital assets. Mr. Bowman discussed his need for an antenuptial agreement with Hyatt.

3.4     Hyatt provided Mr. Bowman with a case number of 0219872 and referred Mr. Bowman to Ms. Courtney McDonnell Snodgrass, an attorney with the McDonnell Law Firm, P.A.

2

3.5     On or around January 13, 2012, relying on Hyatt's referral to an experienced attorney to meet his legal needs, Mr. Bowman contacted Ms. Snodgrass to discuss the Antenuptial Agreement. Ms. Snodgrass agreed to complete the Antenuptial Agreement on behalf of Mr. Bowman and entered an attorney-client relationship with Mr. Bowman.

3.6     Mr. Bowman and Ms. Snodgrass exchanged emails regarding the Antenuptial Agreement and discussed the listing of pre-marital assets. Mr. Bowman represented to Ms. Snodgrass that the Antenuptial Agreement should protect his premarital assets in the event of divorce from becoming marital property under Mississippi law. Mr. Bowman stated that "all income and gains generated from separate assets should remain as separate property" and that "separate property can be transferred as deemed appropriate without losing separate property status..." Ms. Snodgrass never requested to meet with Mr. Bowman in person to review the Antenuptial Agreement or to review its provisions. Mr. Bowman and Ms. Snodgrass had a brief phone call to discuss the Antenuptial Agreement. At no point did Ms. Snodgrass ever inform Mr. Bowman that joint titling of property purchased post-marriage with non-marital property after marriage could result in the property becoming marital property upon divorce. The purpose of the Antenuptial Agreement was to protect Mr. Bowman from losing his premarital assets in the event of a divorce.

3.7     On January 18, 2012, five days after Mr. Bowman made initial contact with Ms. Snodgrass, after an exchange of emails and a phone call, Ms. Snodgrass forwarded an updated draft of the Antenuptial Agreement to Mr. Bowman. A copy of the executed Antenuptial Agreement drafted by Ms. Snodgrass is attached hereto as Exhibit A.

3.8     Both Mr. Bowman and Ms. Sills had independantly accumulated substantial wealth prior to their marriage. Attached to the Antenuptial Agreement was a schedule of Mr.

3

Bowman's premarital assets, including but not limited to Mr. Bowman's home in Texas, IRA accounts, savings accounts, restricted stock accounts, and a 401(K) account. Ms. Sills' schedule identified a residence, two rental houses, various investments, and retirement accounts.

3.9     The Antenuptial Agreement stated in part that "[e]ach party desires to keep all of his or her nonmarital property, whether now owned or hereafter acquired from whatsoever source, free from any claim of the other arising from their forthcoming marriage, unless specifically treated otherwise below."

3.10     The Antenuptial Agreement further stated in part that "[a]ll property, including but not limited to, realty, money accounts, investments, professional holdings, business interests and professional partnership assets, acquired by either party after their marriage shall be nonmarital property if the asset is one that traditionally title, e.g. realty, vehicles, boats, etc., and is separately titled in one of the parties' individual names. If such property is jointly titled, it shall be deemed marital."

3.11     Relying on the Antenuptial Agreement to protect his premarital property from becoming marital property though titling, reinvestment or commingling, Mr. Bowman wed Ms. Sills on January 29, 2012.   Mr. Bowman relied on the Antenuptial Agreement and put his premarital assets in jointly held bank accounts with the understanding that his premarital property would be protected, even if his premarital property was reinvested and new purchases of property were made during this marriage with his premarital property.   Mr. Bowman further purchased additional properties with premarital assets that were jointly titled to him and Ms. Sills, believing the newly purchased properties would be non-marital under the Antenuptial Agreement as they were connected to premarital property.

4

3.12    In August of 2015, Ms. Sills and Mr. Bowman separated. On October 16, 2015, Ms. Sills filed her Complaint for Divorce and Petition for Emergency Relief.

3.13    On January 5, 2018, Ms. Sills filed her Motion for Declaratory Judgment to Determine the Validity of the Ante-Nuptial Agreement. Mr. Bowman filed a Motion to Dismiss or Alternatively, for More Definite Statement. Ms. Sills then filed her Motion for Leave to File Out of Time Amended Motion for Declaratory Judgment to Determine the Validity of the Ante-Nuptial Agreement and thereafter filed her Second Motion for Declaratory Judgment to Determine the Validity of Antenuptial Agreement on March 2, 2018.

3.14    On November 2, 2018, the parties to the divorce filed a Joint Consent to Withdraw Fault Grounds for Divorce on Irreconcilable Differences Grounds. The parties agreed that the Court should decide the following issue: equitable division of the parties' marital estate including division of real property, personal property, and financial accounts. On November 5, 2018, an Order on Withdrawal of Fault Grounds for Divorce and to Divorce on Irreconcilable Differences Grounds was granted by the Court.

3.15    After trial of the divorce case, the Court's Opinion and Final Judgment, on December 12, 2019, upheld the validity of the Antenuptial Agreement. The Chancery Court, however, found that the Antenuptial Agreement was "convoluted" and contained "contradicting clauses." Specifically, the Court found

> Page three (3) of the antenuptial agreement states that "property and debts acquired in exchange for property listed on Schedules 'A' or 'B' ... shall remain nonmarital." However, according to provision four (4) on page five (5) of the antenuptial agreement, property acquired during the marriage that is jointly-titled shall be deemed marital property, regardless of how acquired. **These provisions are contradicting clauses.**

> Page nine (9) of the antenuptial agreement contains **an additional contradiction.** It states that "in determining the consideration provided by each party whenever

5

required for a division of property hereunder, the presumption contained under Mississippi common law, or any statute herein enacted, that all property acquired by either party during the marriage is marital property, shall not apply; and further provided that the doctrine that nonmarital property may become marital property by commingling shall not apply."

Exhibit B, Court's Opinion and Final Judgment.

3.16    Before the Chancellor and in reference to the Antenuptial Agreement, Ms. Sills argued that if property were jointly titled, the property would be marital property, regardless of whether the property was connected to property deemed nonmarital on the parties' scheduled nonmarital assets. Ms. Sills interpreted the agreement to say that if property was jointly titled, it became marital property.

3.17    In the Opinion and Final Judgment, the Chancellor found that nonmarital property owned by Mr. Bowman before his marriage and disclosed on his schedule of nonmarital assets became marital property through subsequent joint titling of property purchased with nonmarital assets. For instance, the Court awarded Ms. Sills nonmarital property identified on Mr. Bowman's scheduled assets:

- **43 Bridgewater:** The property was purchased for $191,500.00 during the marriage on September 17, 2012. The property was jointly titled to both parties. Koerber's report indicated that the money used to purchase the property was wired to First American Title Insurance Company from one of Dave's separate accounts... The Court finds, per the antenuptial agreement, that this property is marital as it was acquired during the marriage and jointly titled to the parties...
- **35 Clipper Drive:** The property was purchased during the marriage on April 23, 2013, for $130,500.00. The funds used to purchase the property came from the joint EverBank account (ending in 5079) and the property was jointly titled to the parties. Per the antenuptial agreement, the Court finds this property is marital property.
- **101 North 22ⁿᵈ Avenue:** The property was purchased during the marriage for $80,000. The funds used to purchase the property were wired directly to the closing attorney from Dave's personal EverBank Account. The property was jointly titled to the parties. Per the antenuptial agreement, the Court finds this property to be marital property...

3.18    Under the Chancery Court's Opinion and Final Judgment, based on the conflicting language in the Antenuptial Agreement, Mr. Bowman's premarital property was deemed to be

6

marital property to such an extent that even if Mr. Bowman would have had no Antenuptial Agreement, Mr. Bowman would have fared better under Mississippi's common law.

3.19    As a result of Defendant's negligent drafting of the Antenuptial Agreement, Mr. Bowman has lost nonmarital assets that were to be protected in the event of divorce litigation with a properly and clearly drafted Antenuptial Agreement. Mr. Bowman has also incurred attorneys' fees and costs that he otherwise would not have incurred with a properly drafted Antenuptial Agreement. In the underlying divorce case, due to the conflicting provisions, Mr. Bowman incurred significant legal expenses litigating the Antenuptial Agreement.

3.20    As a result of Defendant's negligent acts and omissions, Mr. Bowman lost 50% of his EverBank Account 5980; 50% of his EverBank Account 5079; 50% of Incredible Bank 0072; 50% of First Bank 2686; 50% of First Bank 2686; 50% of First Bank 2752; 50% of B of I 9944; 50% of proceeds from 60 Harvest Circle; 50% of proceeds (all capital contributions) from the future sale of 40 Acadian Circle; 50% of proceeds from the future sale of 35 Clipper Drive; 50% of rental proceeds from 35 Clipper Drive; 3.5 years accrued interest income on 22 Carriage Parke Drive loan; 50% of the FMV of a Mercedes Benz C300; pre-marital tax refund amounts; and the proceeds (including capital contributions) from the sale of 101 North 22nd Avenue, 42 Bridgewater, and 95 Bienville Trace. The total amount of damages caused to Mr. Bowman has exceeded $500,000.

3.21    On February 21, 2020, Mr. Bowman filed his Notice of Appeal with the Mississippi Supreme Court, appealing the Chancery Court's Opinion and Final Judgment. This appeal is pending before the Mississippi Court of Appeals. As such, the complete scope of Mr. Bowman's damages are unknown at this time.

### IV.    CAUSES OF ACTION
### (MCDONNELL LAW FIRM)

## A.   LEGAL MALPRACTICE

4.1    Mr. Bowman incorporates by reference all prior averments as if set forth fully herein.

4.2    Defendant maintained an attorney client relationship with Plaintiff and, under that relationship, drafted the Antenuptial Agreement to protect Plaintiff's pre-marital assets, which is attached hereto as Exhibit A. Defendant owed Plaintiff the duty to exercise the knowledge, skill, and ability ordinarily possessed by the members of the legal profession.

4.3    Defendant held herself out as having the necessary level of expertise to draft an Antenuptial Agreement. Defendant had a duty to Plaintiff as his attorney to act as a reasonably prudent attorney and with due care in drafting the Antenuptial Agreement and to properly advise Plaintiff as to the effects of the Antenuptial Agreement, as drafted.

4.4    Defendant breached this duty by failing to properly draft the Antenuptial Agreement to protect his premarital assets and/or alternatively by failing to instruct him as to the effect joint titling of property post-marriage would have on his premarital property. Instead, Defendant drafted an Antenuptial Agreement with conflicting provisions and other errors, including typos, and failed to protect Mr. Bowman's premarital assets.

4.5    As a proximate result of Defendant's breach, Mr. Bowman has suffered damages, including emotional distress and attorneys' fees spent litigating over the conflicting provisions as well as the loss of premarital property that was to be protected by a properly drafted Antenuptial Agreement.

## B.   BREACH OF FIDUCIARY DUTY

4.6    Mr. Bowman incorporates by reference all prior averments as if fully set forth herein.

4.7.   Mr. Bowman and Defendant entered an attorney-client relationship. Defendant held a position of trust and confidence with Plaintiff.

4.8   Defendant committed acts constituting a violation of the attorney's fiduciary duty. As a proximate result of the breach of fiduciary duty, Plaintiff suffered injury, including loss of pre-marital property, emotional distress, attorneys' fees, and costs.

## C.   BREACH OF CONTRACT

4.9   Mr. Bowman incorporates by reference all prior averments as if fully set forth herein.

4.10   Mr. Bowman had a contract with Defendant to provide legal services for him. Through the Hyatt Legal Plan, the Defendant received compensation to perform work on behalf of Mr. Bowman.

4.11   Defendant agreed to draft an antenuptial agreement to protect Mr. Bowman's pre-marital assets from in any way becoming marital property upon the event of his divorce.

4.12   Defendant breached this agreement by failing to draft an agreement that protected Mr. Bowman's pre-marital assets.

4.13   As a result of this breach of contract, Mr. Bowman has suffered damages, including attorneys' fees, court costs, emotional distress, and loss of non-marital property in his divorce.

## D.   BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

4.14   Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs.

4.15   Defendant breached its duty to deal with Plaintiff in good faith. Defendant acted with gross disregard for the rights of Plaintiff and failed to act in the best interest of Plaintiff.

9

Plaintiff contracted with Defendant with the expectation that Defendant would draft a document to protect his pre-marital assets and to advise him of the effects of the premarital agreement. Instead, according to the Court's Order, Defendant drafted an incongruous agreement with conflicting provisions. Defendant's breaches proximately caused foreseeable damage to Plaintiff, as stated herein.

## V. CAUSES OF ACTION
### (METLIFE LEGAL PLANS, INC.
### f/k/a HYATT LEGAL PLANS, INC.)

### A. NEGLIGENCE

5.1     Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs.

5.2     Defendant undertook to refer Plaintiff to a competent attorney with experience in handling Antenuptial Agreements. Defendant breached this duty by referring Plaintiff to Ms. Snodgrass and failing to vet Ms. Snodgrass before referring her to Mr. Bowman.

5.3     As a proximate result of Defendant's breach, Plaintiff has suffered and continues to suffer damages.

### B. NEGLIGENT MISREPRESENTATION

5.4     Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs.

5.5     Defendant represented to Mr. Bowman that Ms. Snodgrass was an experienced attorney, fully capable of servicing Plaintiff's legal needs with competency. In Defendant's FAQs and advertisement for the plan, Defendant represents that the plan attorneys have met stringent selection criteria and are competent to provide legal services, including drafting of an Antenuptial Agreement.

5|6     These representations were material to Plaintiff and Plaintiff relied on these representations to his detriment. Plaintiff has suffered and continues to suffer damages proximately caused by Defendant's misrepresentation of existing fact.

## C.     BREACH OF CONTRACT

5|6     Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs.

5|7     Plaintiff entered into a contract with Defendant when Plaintiff enrolled in Hyatt Legal Plans. Plaintiff paid money to Hyatt through his employer as a consideration for referral to competent attorneys to service his legal needs. Defendant breached his agreement by referring him to Ms. Snodgrass and not properly vetting Ms. Snodgrass. As a proximate result of this breach, Plaintiff suffered and continues to suffer damages.

## D.     BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

5|8     Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs.

5|9     Every contract imposes a duty of good faith and fair dealing in its performance and its enforcement. The duty of good faith and fair dealing does not include the goal of maximizing profits that take unfair advantage of the other party. As such, in dealing with Plaintiff, Defendant owed him a duty of reasonable care and impliedly covenanted, as a matter of law, that Defendant would deal with Plaintiff both fairly and in good faith and that Defendant would do nothing to interfere with or frustrate Plaintiff's reasonable expectations.

5|10    Defendant breached the duty of good faith and fair dealing toward Plaintiff. Defendant frustrated Plaintiff's reasonable expectations by failing to properly vet its attorneys under the Hyatt Legal Plan, including Ms. Snodgrass. Such conduct, acts and/or omissions

11

constituting a breach of duty of good faith and fair dealing are the proximate cause, substantial factor, or proximate contributing cause of the foreseeable damages suffered by Plaintiff.

## VI. CAUSES OF ACTION
### (ALL DEFENDANTS)

**A.   GROSSNESS**

6.1     Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs.

6.2     The actions and/or inactions of Defendants as described herein were so careless as to amount to grossness thereby entitling Plaintiff to recovery of punitive damages, costs, and attorneys' fees. As a proximate cause of Defendants' wantonness, Plaintiff is entitled to recovery of punitive damages.

**B.   RESPONDEAT SUPERIOR/VICARIOUS LIABILITY**

6.3     Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs.

6.4     At all times pertinent hereto, Defendants, jointly and severally, are liable for, without limitation, the conduct, acts, breaches, and/or omissions, tortious conduct of their actual or apparent agents, employees, fiduciaries, contractors, officers, directors, and consultants, under the doctrine of respondeat superior, and otherwise as provided by applicable law.

## VII. DAMAGES

7.1     **Consequential Damages.** Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs. Based on the foregoing, Plaintiff has suffered consequential damages, including attorneys' fees to litigate the contradicting and convoluted antenuptial agreement due to Defendant's acts and omissions as well as the loss of

pre-marital property. Plaintiff's premarital assets have been tied up due to the ongoing litigation, causing him further losses.

7.2 **Punitive Damages.** Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs. As a result of Defendants' gross disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages against Defendants in an amount in accordance with their net worth and other factors as instructed by the Court and as determined by the jury.

7.3 **Emotional Distress.** Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs. As a result of Defendants' acts and omissions, Plaintiff has suffered extreme emotional distress.

7.4 **Attorneys' Fees, Legal Expenses, Court Costs, Prejudgment Interest, and Postjudgment Interest.** Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs. As a result of Defendants' gross disregard of Plaintiff's rights, and in order to serve as an example and to prevent other such conduct, Plaintiff seeks recovery of all attorneys' fees, legal expenses, court costs, prejudgment interest and postjudgment interest.

## VIII. PRAYER FOR RELIEF

8.1 Plaintiff re-alleges and incorporates by reference the factual allegations as set forth in the foregoing paragraphs. Pursuant to the Mississippi Rules of Civil Procedure, Plaintiff requests that all issues of fact in this case be tried by a jury. Plaintiff prays for judgment against Defendants, as follows:

a. For damages to be determined by the jury, in an amount exceeding the minimum jurisdictional amount of this Court, and adequate to compensate Plaintiff for all the damages he has sustained; including but not limited to those set forth above;

b. For all additional general and special damages caused by the conduct of Defendant;

c. For the costs of litigating this case; including attorneys' fees and expenses;

d. For all prejudgment and post judgment interest allowable by law;

e. For punitive damages sufficient to punish Defendants for gross misconduct and to deter Defendants from repeating such misconduct, as well as to deter others defendants in other actions faced with similar circumstances in comparison to Defendants; and

f. For all other relief to which Plaintiff is entitled by Mississippi law.

This the __4th__ day of January, 2021.

Respectfully submitted,

DAVID BOWMAN

By: _____

E. Taylor Polk

OF COUNSEL:
Michael A. Heilman (MSB No. 2223)
E. Taylor Polk (MSB No. 103653)
HEILMAN LAW GROUP, P.A.
Meadowbrook Office Park
4266 Interstate 55 North, Suite 106
Jackson, Mississippi 39211
Telephone: (601) 914-1025
Facsimile: (601) 960-4200
mheilman@heilmanlawgroup.com
jnisbett@heilmanlawgroup.com
tpolk@heilmanlawgroup.com

# ANTENUPTIAL AGREEMENT

THIS *ANTENUPTIAL AGREEMENT* is entered into on the $\underline{21st}$ day of January, 2012, by **David Eugene Bowman**("Dave") and **Pamela Robin Sills** ("Robin") for the purpose of clarifying and establishing their respective rights and interests arising from their contemplated marriage. Dave and Robin currently reside in Hattiesburg, Mississippi, and each contemplates residing after marriage in Hattiesburg, Mississippi.

## *RECITALS:*

A.  Dave and Robin intend to marry after the date of this *Agreement*. The parties enter this *Agreement* to eliminate, as much as possible, any future impediment to their marriage which might arise from uncertainties in their respective financial responsibilities to each other.

B.  Each party desires, to the fullest extent permitted by law:

(I)  to resolve in advance of their marriage financial claims which each might have, or might hereafter acquire, against the other party and/or the other party's estate; and

(ii)  to provide for the settlement of certain property and other rights that may arise because of their contemplated marriage.

C.  Both parties anticipate they shall reside in the State of Mississippi.

D.  Each party desires to keep all of his or her nonmarital property, whether now owned or hereafter acquired from whatsoever source, free from any claim of the other arising from their forthcoming marriage, unless specifically treated otherwise below.

E.  Each party has made a full and accurate disclosure to the other of his or her financial condition and worth. These disclosures, attached as Schedule "A" and Schedule "B"

1



**EXHIBIT**
1

constitute the entirety of the parties' respective nonmarital property as of the date of this *Agreement*.

F.    Dave and Robin have discussed an antenuptial agreement and in general terms. Now, regarding specific terms, the parties have fully reviewed the terms of this *Agreement* well in advance of their marriage date.

G.    Each of the parties understands, and has been advised by his or her legal counsel, or has been given opportunity to be advised, of the rights each would have in the event of a dissolution of the marriage or the death of the other party while the marriage continues. Each further acknowledges that he or she:

(i)    considers and believes that they have a reasonable approximation of the financial estate of the other and of their rights absent this *Agreement*;

(ii)    considers the provisions of this *Agreement* fair and reasonable and would accept these provisions no matter how much more wealth the other party might now have or hereafter acquire by any method;

(iii)    acknowledges complete understanding of the effects of this *Agreement*; and

(iv)    specifically acknowledges his or her understanding that he or she is giving up and waiving certain rights that might well have great value, in exchange for the provisions of this *Agreement*, and each does so voluntarily, freely and willingly.

NOW, THEREFORE, for and in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, each to the other in hand paid,

2

the receipt and sufficiency of which are hereby acknowledged, and in all material respects are incorporated herein by reference.

1.  *Assets and Liabilities*.

Dave has listed his current assets and liabilities on the attached Schedule "A". Robin has likewise listed her current assets and liabilities on the attached Schedule "B". Schedules "A" and "B" were made available to both parties prior to the execution of this *Agreement*. Such Schedules indicate the approximate pre-marital assets and liabilities and net worth of each party. Schedule "A" represents a fair and full disclosure of Dave's assets and liabilities and constitutes a reasonable approximation of the values of such assets, liabilities and net worth. Likewise, Schedule "B" represents a fair and full disclosure of Robin's assets and liabilities and constitutes a reasonable approximation of the values of such assets, liabilities and net worth.

2.  *Nonmarital Property*.

For the purposes of this *Agreement* and any future legal proceedings involving the parties or their successors in interest, nonmarital property shall mean all property now owned, including all income and reinvestment therefrom. The parties' respective nonmarital assets and nonmarital properties are listed on Schedules "A" and "B". Also, the following assets acquired and assets incurred by either party during the marriage is also considered nonmarital:

(a)    Property acquired by gift, bequest, devise or descent, including gifts from one outside the marriage, subsequent to the date of their marriage;

(b)    Property and debts acquired in exchange for property listed on Schedules "A" or "B" or acquired in exchange for property acquired by gift, bequest, devise or desc

3

(c)     Property and debts acquired by a party after a separation of the parties or their divorce;

(d)     Property of Alexis Sills, including but not limited to her savings account (Bankcorp South), college fund, and/or IRS Section 529 college account (Edward Jones);

(e)     The increase in value of all nonmarital property and debts as herein defined, irrespective of whether the increase results from a contribution of marital property (if contribution is agreed to by both parties), nonmarital property or the personal effects of a party, including, but not limited to, the increase in equity by reason of expenditure of personal efforts or services, or additional contributions or deposits or the payment of any mortgage, debt or lien upon such property, as well as all income, earnings, dividends, stock splits, interest or other appreciation in the value of the nonmarital property is likewise nonmarital property, all without right of reimbursement.

(f)     The parties acknowledge that as of the date of this agreement, each party owns his and her own respective residence: Dave – 240 Harper Court, Keller, TX 76248 and Robin – 40 Acadian Circle, Hattiesburg, MS and all furnishings and contents therein located at each address is the nonmarital property of the respective owner and shall remain nonmarital property. Upon the death of either party, each party agrees that he or she waives any legal rights to claim homestead to live in the other party's house.

(g)     The parties further acknowledge that Dave currently has a tax loss carry over from prior years that will continue to be carried over for a period of years hereafter. While the parties may, after marriage, file a joint return, Robin shall only enjoy the benefits of Dave's carry over loss while married and only if filing a joint tax return. In the event of death,

4

separation or dissolution of marriage, said tax loss carry over shall remain the non-marital property of Dave.

3.    *Unintentional Transmutation of NonMarital Property*

Both Dave and Robin specifically reject the concept of unintentional transmutation of nonmarital property into marital property by commingling such property.    The parties specifically reserve the right to give and/or bequeath items of nonmarital personal property to whomever they may choose.

4.    *Character of Property Acquired After Marriage.*

All property, including but not limited to, realty, money accounts, investments, professional holdings, business interests and professional partnership assets, acquired by either party after their marriage shall be nonmarital property if the asset is one that traditionally titled, e.g., realty, vehicles, boats, etc., and is separately titled in one of the parties' individual names. If such property is jointly titled, it shall be deemed marital.  Should the parties acquire property during the marriage which typically is not titled, deeded or otherwise vested by virtue of documentation, such property is marital unless deemed to be nonmarital by subsequent written agreement of the parties.

5.    *Treatment, Gifting or Transfer of Nonmarital Property.*

(a)    Subject to the limitations herein set forth, each party shall have the unfettered right to dispose of his or her nonmarital property by gift, transfers to or in trust, or by Will during his or her lifetime without interference by the other party. During the contemplated marriage, each party is to have the full right to own, control and dispose of his or her nonmarital property without the necessity for the consent or joinder of the other party.  A transfer of

5

nonmarital property by either party individually will be deemed to have conveyed the same title that the transfer would convey if the marriage had not existed.

(b) In case either party seeks to mortgage, sell or transfer his or her nonmarital property, whether real or personal, whether the joinder of the party is required by the purchaser or mortgagee, the non-owning party will join in the execution of such documents as may be reasonably necessary to complete the intended transaction, so long as such joinder does not obligate the non-owning party to any contemplated or resultant debt. Such joinder shall have no effect on the nonmarital character of such property.

6.     *Death of Either Party*.

Except as provided in this *Agreement*, at the death of either party, no claim by inheritance, descent, curtsey, right of renunciation, or maintenance, shall be made by either party against the other, or against the nonmarital property of the other. Each waives and renounces any legal and statutory rights as a surviving spouse that might under law be set up against any part or parcel of the nonmarital estate of the other and does consent that the nonmarital estate of each shall descend, or be disposed of by Will, to the heirs, legatees or devisees of each of the parties free and clear of any claim by inheritance, descent, curtsey, maintenance, right of renunciation of the Will by the testator's spouse, or any claim otherwise given by law to husband and wife. Each party also waives and renounces any claim to a widow's or widower's allowance to the extent that such allowance would be paid from nonmarital property. This document shall be a sufficient and lawful release and waiver of same and shall debar the other accordingly.

7.     *Rights upon Dissolution, Separation or Annulment*.

6

Except as provided in this *Agreement*, upon the dissolution of the parties' marriage, the following terms and conditions shall apply:

(a) Each party shall retain his or her nonmarital property free of any right or claim of the other.

(b) Nonmarital assets and nonmarital debts, as defined by this *Agreement*, shall be given no consideration by any Court when dividing marital property.

(c) The parties intend this *Agreement* to provide an expedient resolution of all issues relating to the parties' marital and nonmarital property in the event of a dissolution, legal separation or annulment of their marriage and intend to be bound by the terms. To affect this intent, the following duties and obligations will apply:

(i) Any appropriate pleading seeking a legal separation, dissolution or annulment shall specifically reference this *Antenuptial Agreement*.

(ii) The validity and enforceability of this *Agreement* shall be immediately acknowledged by a written stipulation signed by the parties.

(iii) In the event either party challenges the enforceability or interpretation of any term of this *Agreement*, then the question shall be bifurcated and immediately submitted to the courts for determination.

(iv) The challenging party, if unsuccessful in that challenge, shall be solely responsible for their own attorneys fees and costs of court, as well as responsible for the like fees and costs incurred by the non-challenging party.

(d) Both parties waive alimony of any kind.

8. *Consents to transfers.*

7

Each party agrees that, upon the request of the other party or of his or her heirs, legal representatives, assigns or devisees, he or she will:

(a)     Execute and acknowledge any instrument concerning any nonmarital property of the other to evidence the release of his or her rights in such property;

(b)     Execute and acknowledge any instrument that may be desirable or necessary to transfer an interest in property of the other acquired in a community property law state to the persons entitled to the property in accordance with this *Agreement*; and

(c)     Execute a consent to any Will or Trust that does not conflict with this *Agreement*, and execute a waiver of elective rights.

(d)     Join in any split gift for tax purposes, so long as the joinder does not cause the non-donor to incur any transfer taxes or use any of the non-donor's Unified Credit as defined by the Internal Revenue Service.

9.     *Construction of Agreement.*

The parties agree that the following provisions shall govern the interpretation and enforcement of this *Agreement*.

(a)     This *Agreement* shall become effective only on the solemnization of the parties marriage;

(b)     If any part of this *Agreement* is held unenforceable, then the remaining parts of this *Agreement* shall remain enforceable.

(c)     No failure of a party to enforce any part of this *Agreement* shall affect either party's right to enforce any part of this *Agreement*, and no waiver of a breach of any part of this *Agreement* shall waive any such breach of any part of this *Agreement*.

8

(d)     The terms and provisions of this *Agreement* shall be subject to modification and amendment by mutual agreement of the parties at any time and from time to time, but such modifications and amendments shall be effective only after they have been made in writing and executed, witnessed and acknowledged by the parties, consistent with the specific requirements of this *Agreement*.

(e)     The validity, interpretation and enforcement of this *Agreement* shall be governed by the laws of the State of Mississippi, even if the parties change their residence to another state, and this *Agreement* shall bind and be enforceable by the parties and their heirs, legal representatives, assigns and devisees; provided, however, that in determining the consideration provided by each party wherever required for a division of property hereunder, the presumption contained under Mississippi common law, or any statute hereinafter enacted, that all property acquired by either party during the marriage is marital property, shall not apply; and further provided that the doctrine that nonmarital property may become marital property by commingling shall not apply.

(f)     If during their marriage the parties are residents of, or own property situated in any state other than Mississippi, their interest and rights in property shall, notwithstanding the law of such state, be determined under this *Agreement*.

(g)     Because valuation in some cases is an art and not a science, and there may be differences of opinion as to the value of some assets, such differences shall not affect the enforceability of this *Agreement* unless there is intentional misrepresentation.

(h)     Captions are for convenience only and are not intended to alter any of the provisions of this document.

9

(i)    References to the "commencement" of a proceeding for legal separation, dissolution or annulment means the appropriate pleadings are served on Dave or Tammy.

(j)    All exhibits to this *Agreement* are incorporated herein by reference, and those exhibits are to be part of this *Agreement*.

IN WITNESS WHEREOF, the parties to this *Agreement* have set their hands on this 21st day of January 2012.

David Bowman
Dave Eugene Bowman

Pamela Robin Sills

AGREEMENT PREPARED BY:

COURTNEY MCDONNELL SNODGRASS (MS Bar #100924)
THE McDONNELL LAW FIRM, P.A.
1015 Howard Ave. Suite B
Post Office Box 1403
Biloxi, Mississippi 39533
Telephone: (228) 432-7092
Facsimile: (228) 435-7879
Attorneys for David Eugene Bowman

10

## ATTORNEY CERTIFICATION FOR DAVID EUGENE BOWMAN

The undersigned hereby certifies that the undersigned (i) is an attorney at law, duly licensed and admitted to practice in the State of Mississippi: (ii) has been employed by **David Eugene Bowman**, a party to this Agreement; and (iii) has advised such party with respect to this Agreement and explained to such party the meaning and legal effect of it; and that **David Eugene Bowman**, has acknowledged full and complete understanding of this Agreement and its legal consequences, has acknowledged that this Agreement represents a fair agreement between the parties, and has freely and voluntarily executed this Agreement in the attorney's presence.

This the 21st day of January 2012.

/s Courtney McDonnell Snodgrass
COURTNEY MCDONNELL SNODGRASS (MS Bar #100924)
**THE MCDONNELL LAW FIRM, P.A.**
1015 Howard Ave. Suite B
Post Office Box 1403
Biloxi, Mississippi 39533
Telephone: (228) 432-7092
Facsimile: (228) 435-7879
Attorneys for David Eugene Bowman

11

## CERTIFICATION FOR PAMELA ROBIN SILLS

The undersigned hereby certifies that the undersigned is a party to this Agreement; and Pamela Robin Sills has acknowledged full and complete understanding of this Agreement and its legal consequences, has acknowledged that this Agreement represents a fair agreement between the parties, and has freely and voluntarily executed this Agreement.

This the 21 day of January, 2012.

_____
PAMELA ROBIN SILLS

12

## Exhibit A

### Separate Property of David Eugene Bowman
as of January 16, 2012

The following identifies the assets that are, or will be, the separate property of David Eugene Bowman:

| Asset/Description | Approximate Value |
|---|---|
| 1. Real property located at 240 Harper Ct., Keller, TX 76248 | $560,000 |
| 2. Household furniture, fixtures, contents, and appliances | $125,000 |
| 3. All personal items, including jewelry, clothing, collectibles (stamps, coins, record collection, etc.) | $175,000 |
| 4. 2006 BMW 750i | $ 30,000 |
| 5. Agriculture Federal Credit Union (Savings and IRA accounts) | $153,500 |
| 6. Alliant Credit Union (Savings Account) | $249,400 |
| 7. Alliant Credit Union (Health Savings Account) | $ 8,500 |
| 8. Ally Bank (Certificate of Deposit) | $225,000 |
| 9. American Express Bank (Savings Account) | $ 99,000 |
| 10. JP Morgan Chase Bank (Savings Account) | $ 2,500 |
| 11. Capital One Bank (Savings Account) | $254,300 |
| 12. Everbank (Checking and Money Market Accounts) | $ 8,000 |
| 13. Everbank (IRA Account) | $ 5,100 |
| 14. Fidelity (IRA Accounts) | $ 2,400 |
| 15. Incredible Bank (Money Market Account) | $250,200 |
| 16. Morgan Stanley Smith Barney Stock Plan Services (Restricted Stock Account) | $ 43,400 |
| 17. Morrill and Janes Bank (Money Market Account) | $252,500 |
| 18. Northwestern Mutual (Life Insurance Policy – Cash Value) | $ 5,700 |
| 19. Pentagon Federal Credit Union (Savings Account) | $ 100 |
| 20. Salem Five Bank (Savings Account) | $251,200 |
| 21. Security Service Federal Credit Union (Savings and Certificate of Deposit Accounts) | $ 900 |
| 22. T. Rowe Price (401K Account) | $108,000 |
| 23. T. Rowe Price (Nonqualified Retirement Account) | $ 51,656 |
| 24. Tennessee Commerce Bank (Certificate of Deposit) | $242,000 |
| 25. TradeKing (IRA Brokerage Account) | $ 19,600 |
| 26. Wang Investments – Sogotrade (Brokerage Account) | $ 65,500 |
| 27. Social security plans (US/UK) and pension, retirement, profit sharing, and stock option/restricted stock plans associated with employment with the US Government, ITT, Loral Space and Communications, Textron, and Meritor | $ TBD |

| Liabilities/Description | Amount |
|---|---|
| 1. Freddie Mac (240 Harper Court Mortgage) | $308,600 |

Initialed For Identification & Acknowledgement
David Eugene Bowman
Pamela Robin Sills

13

## Exhibit B

### Separate Property of Pamela Robin Sills as of January 16, 2012

The following identifies the assets that are, or will be, the separate property of David Eugene Bowman:

| Asset/Description | Approximate Value |
|---|---|
| 1. Real property located at 40 Acadian Circle, Hattiesburg, MS 39402 | $295,000 |
| 2. Household furniture, fixtures, contents, and appliances | $125,000 |
| 3. All personal items, including jewelry, clothing, collectibles | $150,000 |
| 4. 2005 Mercedes C230 | $ 12,000 |
| 5. Regions (Checking and Savings Accounts) | $ 35,000 |
| 6. Bancorp South (Checking and Savings Accounts) | $ 12,000 |
| 7. Grand Bank (Savings Account) | $  5,000 |
| 8. Rental Property located 22 Carriage Parke, Purvis, MS 39475 | $265,000 |
| 9. Rental Property located 420 Sam Rayburn, Hattiesburg, MS 39402 | $149,000 |
| 10. Thrift Savings Plan (TSP – US Government) | $175,000 |
| 11. Hartford Annuity | $125,000 |
| 12. Edward Jones (IRA) | $ 30,000 |

| Liabilities/Description | Amount |
|---|---|
| 1. Wells Fargo (40 Acadian Circle Mortgage) | $257,000 |
| 2. Grand Bank (22 Carriage Park Mortgage) | $200,000 |
| 3. Regions (420 Sam Rayburn Mortgage) | $ 49,000 |

Initialed For Identification & Acknowledgement
David Eugene Bowman
Pamela Robin Sills

14

IN THE CHANCERY COURT OF LAMAR COUNTY, MISSISSIPPI

ROBIN SILLS BOWMAN                                                    PLAINTIFF

V.                                                           CAUSE NO. 15-cv-00634-CS

DAVID EUGENE BOWMAN                                                  DEFENDANT

## OPINION AND FINAL JUDGMENT

On June 11, 2019 and June 12, 2019, this cause came on for trial upon the Plaintiff's *Complaint for Divorce and Petition for Emergency Relief* and the Defendant's *Answer to Complaint for Divorce and Petition for Emergency Relief.* The Court, having jurisdiction over the subject matter and the parties, and having considered the evidence and testimony and submissions of counsel, and having observed the appearance, demeanor, and deportment of the parties and witnesses in open court, and being fully advised in the premises, does find, adjudicate, and order as follows:

### Course of Proceedings

Plaintiff Robin Sills Bowman (hereinafter "Robin") filed her *Complaint for Divorce and Petition for Emergency Relief* on October 16, 2015. Robin alleged habitual cruel and inhuman treatment as a ground, and, alternatively, asserted irreconcilable differences as the cause of their separation and ground for divorce. She requested a temporary restraining order that would prohibit David Bowman (hereinafter "Dave") from contacting her, coming to the marital home, and from removing, destroying, or otherwise dissipating any assets. Dave filed his *Answer to Complaint for Divorce and Petition for Emergency Relief* on November 17, 2015.

A *Temporary Order* was entered on January 15, 2016, which mutually restrained and enjoined the parties from having any contact with each other. The Court also appointed Hon. Damon Carpenter as "Special Commissioner" to temporarily administer the joint assets of the

1


EXHIBIT
B

parties. Dave was ordered to provide bank statements for the last three (3) years for each bank account held by him individually or jointly held by the parties. Robin was awarded temporary use and ownership of the 2011 Mercedes C300 and the marital home, while Dave was awarded temporary use and ownership of the BMW.

On March 3, 2016, the Hon. Damon Carpenter filed his *Motion to Withdraw*, stating that he accepted employment in another state and was unable to continue to serve as the Special Commissioner in this matter. The Court entered its *Order Appointing Special Commissioner* on March 10, 2016, in which the Hon. Damon Carpenter was allowed to withdraw and the Hon. Allen Flowers was appointed as Special Commissioner to temporarily administer the joint assets of the parties.

An *Agreed Protective Order* was entered on April 14, 2016, which stated, *inter alia*, that any bank documents produced by Dave were not to be included in the Court file. Further, that any produced records were to be destroyed at the conclusion of the case. An *Order on Status Conference* entered on July 22, 2016, stated that the Special Commissioner was to be provided with a copy of the prenuptial agreement. Further, that Dave Bowman was to prepare an Assets and Activities Report for Rainbow Ventures, LLC, and that the Special Commissioner was to address the disputes between the parties pertaining to marital assets prior to the trial.

On July 28, 2016, Dave Bowman filed a *Motion to Bifurcate, a Motion to Continue*, and a *Motion for Court Ordered Mediation*. Although it appears that these *Motions* were set for hearing on August 4, 2016, there was not an Order entered after the hearing. On November 29, 2016, counsel for Dave Bowman filed a *Motion to Withdraw* and an *Agreed Order* was entered on December 15, 2016, in which Dave Bowman's counsel was allowed to withdraw and the Hon. Bonnie Smith and the firm of Bridgers Smith to enter their appearance on his behalf.

2

On December 16, 2016, the Hon. John Smallwood filed an *Attorney's Quantum Meruit Lien*, stating that Dave Bowman had an outstanding balance of $7,815.50 relating to attorney fees. On March 23, 2017, Robin filed her *Motion to Compel Second Set of Supplemental Discovery* and set her *Motion* for hearing on April 6, 2017. A Status Conference was set for July 25, 2017, and an *Order on Status Conference* was entered on August 9, 2017. This *Order* stated that the Hon. Allen Flowers was relieved of his duties as Special Commissioner and he was to submit an itemized statement within thirty (30) days. The Koerber Company, P.A. (hereinafter "Koerber") was appointed as a forensic accounting expert for the Court. Dave was responsible for the initial payment and the Court was to determine a division of the final bill at the trial.

An *Agreed Scheduling Order* was entered on September 14, 2017, stating that all depositions were to be concluded by September 15, 2017, and that Koerber was to submit their written report by October 2, 2017. All *Motions in Limine* were to be filed with the Court on or before October 16, 2017, and the parties were to submit their case to mediation on or before October 16, 2017.

On January 5, 2018, Robin filed her *Motion for Declaratory Judgment to Determine the Validity of Ante-Nuptial Agreement*. She claimed that Koerber needed guidance as to the validity of the Antenuptial Agreement in order to move forward with its forensic analysis of the parties' assets. On January 16, 2018, Dave filed his *Motion to Dismiss or Alternatively, for More Definite Statement*. In response, on February 21, 2018, Robin filed her *Motion for Leave to File Out of Time Amended Motion for Declaratory Judgment to Determine the Validity on Ante-Nuptial Agreement* and subsequently filed her *Second Motion for Declaratory Judgment to Determine the Validity of Ante-Nuptial Agreement* on March 2, 2018, in which she reasserted the allegations and

3

information contained in her initial *Motion for Declaratory Judgment* and included, with specificity, the items in the Antenuptial Agreement on which Koerber needed clarification.

On June 22, 2018, an *Order Granting Motion for Leave to File* was entered. The Court granted the Plaintiff ten (10) days from the date of the Order to file her *Amended Motion*. The Court also determined that the Antenuptial Agreement was presumed valid under law until ruled otherwise by the Court following an evidentiary hearing. The Court entered an *Amended Order* on July 5, 2018, which stated that in addition to the provisions from the *Order* entered June 22, 2018, Plaintiff's counsel was ordered to compensate Defendant's counsel in the amount of two hundred dollars ($200.00) for time preparing for and participating in the telephonic conference.

On July 23, 2018, the Court received correspondence from Koerber requesting additional time to complete their financial analysis. On July 31, 2018, Richard & Thomas, PLLC, filed their *Complaint for Interpleader and Other Relief* stating that on November 4, 2016, Rainbow Ventures, LLC, owned by the Bowmans, sold a parcel of real property and the proceeds from that sale remained in the escrow account of Richard & Thomas, PLLC. Richard & Thomas stated that due to the disagreement of the parties, they were unable to determine property disbursement of the funds and requested that they be allowed to deposit the funds into the registry of the Court.

On July 31, 2018, an *Order Resetting Trial* was entered which granted a continuance to Koerber, ordered the parties to participate in mediation on or before October 12, 2018, and reset the matter for trial on October 31, 2018.

On August 21, 2018, an *Order Pursuant to Status Conference* was entered stating that Richard & Thomas, PLLC should tender the funds belonging to the Bowmans currently held in their trust account into the registry of the Court. Counsel for Robin was ordered to review the assets and advise what assets, if any, were not disputed as to their classification of nonmarital

4

property. The Court reserved the right to assess costs for Koerber after trial. Also filed on August 21, 2018, was an *Answer to Complaint for Interpleader and Other Relief* filed by Dave in which he requested reimbursement of a loan in the amount of $74,600.00 in addition to accrued interest.

The Order entered on August 23, 2018, granted the Clerk of this Court the authority to accept certain funds from Richard and Thomas into the registry, specifically $131,814.14 from the sale of real property, and $118,737.22 from the satisfaction of a lien. Richard and Thomas were thereby dismissed from the matter and awarded attorney fees in the amount of $450.00.

On November 2, 2018, the parties filed a *Joint Consent to Withdraw Fault Grounds for Divorce and to Divorce on Irreconcilable Differences Grounds*. The parties agreed that that the Court should decide the following issue: equitable division of the parties' marital estate including the division of real property, personal property, and financial accounts. On November 5, 2018, an *Order on Withdrawal of Fault Grounds for Divorce and to Divorce on Irreconcilable Differences Grounds* was entered in which the Court granted the parties' *Motion*.

On November 14, 2018, the *Expert Report of The Koerber Company* was filed under seal. On November 20, 2018, the parties filed their *Joint Motion for Order Authorizing Payment of Court Appointed Expert Fees and Expenses*. Both stated that they reviewed the invoice from Koerber and neither party objected. As such, they requested that the Court order the Clerk of the Court to pay the invoice (in the amount of $25,000.00) from the funds held by the Clerk. The Court granted this *Motion* in an *Order* dated November 29, 2018. The Clerk of the Court facilitated the payment on that same day (MEC Document # 80).[1]

---

[1] The current balance held in the registry of the Court after receiving a check in the amount of $131,814.14 and a check in the amount of $118,737.22 and drafting a check to pay the $25,000.00 invoice from Koerber is $225,551.36.

5

Case: 37CH1:15-cv-00634-CS    Document #: 91    Filed: 12/12/2019    Page 5 of 32
Case: 24CI2:21-cv-00002    Document #: 1    Filed: 01/04/2021    Page 33 of 60

On March 4, 2019, S. Christopher Farris, entered his appearance on behalf of Robin Bowman and an *Agreed Order Allowing Substitution of Counsel* was entered on March 6, 2019. On March 7, 2019, counsel for Robin filed a *Motion to Continue Trial*, which was opposed by counsel for Dave on March 12, 2019. An *Order Continuing and Resetting Trial* entered on March 29, 2019, set the matter for trial on June 11 and June 12, 2019. On August 6, 2019, John D. Smallwood filed his *Notice of Satisfaction of Lien*, stating that the quantum meruit lien (filed on December 16, 2016 as MEC Document # 33) had been paid in full.

## The Trial

Prior to receiving testimony or evidence, the Court notes that there were no MRCP Rule 81, process, notice, or jurisdictional issues raised. Accordingly, the Court deems any such issues waived. The parties proceeded to the trial of the case. MRCP 12(h)(1); *Ridgeway v. Hooker*, No. 2016-CA-SCT Consolidated with No. 2016-IA-01428-SCT (decided February 15, 2018); See also *Pace v. Pace*, 16 So.3d 734 (Miss. Ct. App. 2009); *Isom v. Jernigan*, 840 So.2d 104 (Miss. 2003); *Chasez v. Chasez*, 957 So.2d 1031 (Miss. Ct. App. 2007); *Karenina ex rel. Vronsky v. Presley*, 526 So.2d 518 (Miss. 1988); *Price v. McBeath*, 989 So.2d 444 (Miss. Ct. App. 2008); *Carroll v. Carroll*, 976 So.2d 880 (Miss. Ct. App. 2007).

Moreover, as the parties participated in trial without raising any such objection, [whether same be argued as procedural or jurisdictional], the Court deems the doctrine of judicial estoppel applicable here. Either party raising any such subsequent objection as to a notice, procedural, or jurisdictional issue would be tantamount to a party taking a position contrary to that taken in the litigation which has been concluded by trial. *Kirk v. Pope*, 973 So.2d 981 (Miss. 2007); *Clark v. Neese*, 131 So.3d 556 (Miss. Ct. App. 2013).

6

Case: 37CH1:15-cv-00634-CS    Document #: 91    Filed: 12/12/2019    Page 6 of 32
Case: 24CI2:21-cv-00002    Document #: 1    Filed: 01/04/2021    Page 34 of 60

## Discussion, Analysis, Findings, and Conclusions

The Court finds that it has jurisdiction of the parties and subject matter. The Court finds that the parties were adult resident citizens of Lamar County, Mississippi, and were such for six (6) months or longer prior to the filing of Robin's *Complaint for Divorce*. The Court finds that the parties were married on February 25, 2012, and finally separated on August 13, 2015, in Lamar County, Mississippi, and that they have not since lived nor cohabitated together as husband and wife. There were no children born of the marriage and no children are expected to be born to the marriage union of the parties. The Court finds that the parties are entitled to an absolute divorce on the ground of irreconcilable differences.

Prior to the marriage, the parties executed an antenuptial agreement on January 21, 2012, (Ex. 4) which contains a schedule of the separate property of each party. One issue before the Court is the validity of the antenuptial agreement regarding the classification of marital/nonmarital property and whether certain items of nonmarital property have been commingled with marital property to the extent that the property could be subject to an equitable distribution.

### Applicability of Antenuptial Agreement

The Mississippi Supreme Court has held that an antenuptial contract is just as enforceable as any other contract. *Estate of Hensley v. Estate of Hensley*, 524 So.2d 325, 327 (Miss. 1988); *see also Smith v, Smith*, 656 So.2d 1143, 1147 (Miss. 1995); *Mabus v. Mabus*, 890 So.2d 806 (Miss. 2003). Prenuptial agreements also have the heightened requirement of being fair in the execution. *Estate of Hensley*, 524 So.2d at 327, "Fair in the execution" means that the agreement must be entered into voluntarily, and each party must disclose his or her financial assets. *Id.*, see also *Mabus v, Mabus*, 890 So.2d at 818-19. Fair disclosure can be found either by the parties providing financial disclosure statements or by their independent knowledge of each other's financial state.

7

In the case at hand, the parties stated in the antenuptial agreement that they have each made a "full and accurate disclosure to the other of his or her financial condition and worth." (See Antenuptial Agreement, Exhibit 4, page 1, section E).

Fair disclosure, as explained in *Sanderson v. Sanderson*, 170 So.3d 430 (Miss. 2014), can be found either by the parties providing financial disclosure statements or by their independent knowledge of the other's financial state. The Bowmans attached a detailed list of property that included the approximate values of said property and agreed that all property contained on their respective lists would remain separate property, not subject to commingling, and therefore would not be converted to marital property. Both parties signed the document and put their initials on the page with each party's list of property. As such, the Court finds that the antenuptial agreement executed by the parties is procedurally conscionable.

The higher Courts in Mississippi have not given clear guidance on whether or not it is required for the Chancellor to consider the substantive conscionability or unconscionability of a prenuptial agreement. In *Mabus*, it was stated that a prenuptial agreement is a contract like any other contract that is subject to the same rules of construction and interpretation applicable to contracts. *Mabus*, 890 So.2d at 819 (citing *Estate of Hensley*, 524 So.2d at 327). However, in *Sanderson*, it was stated that prenuptial agreements cannot be contracts like any other if courts cannot consider whether a prenuptial agreement can be substantively unconscionable. "The law of Mississippi imposes an obligation of good faith and fundamental fairness in the performance of *every* contract...this requirement is so pronounced that courts have the power to refuse to enforce any contract...in order to avoid an *unconscionable* result." *Sawyers v. Herrin-Gear Chevrolet Co.*, 26 So.3d 1026, 1034-35 (Miss. 2010) (emphasis added); see also *Covenant Health & Rehab. Of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So.3d 695, 705 (Miss. 2009).

8

Within contract law, there are many different types of contracts. The Legislature has carved out a remedy for unconscionable sales contracts. See Miss. Code Ann. § 75-2-302 (rev. 2002). However, Section 75-2-302 has been applied to other types of contracts, such as arbitration contracts. *Covenant Health & Rehab. Of Picayune*, 14 So.3d at 706. Similarly, the Court has analyzed the unconscionability of domestic relations contracts. *See id.* ("We also have found contracts to be unconscionable for clauses other than arbitration agreements."); *In the Matter of Johnson's Will*, 351 So.2d 1339 (Miss. 1977) (considering unconscionability for a contract between a husband and wife preventing a wife from revoking her husband's will); *West v. West*, 891 So.2d 203, 213 (Miss. 2004) ("A contract may be either procedurally or substantively unconscionable."). Accordingly, because prenuptial agreements are contracts like any other, substantive unconscionability must be considered.

Courts of equity "will not enforce an unconscionable contract. *In Terre Haute Cooperage, Inc. v. Branscome*, 203 Miss. 493, 35 So.2d 537 (1948), this Court defined an unconscionable contract as 'one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other.'" *In re Johnson*, 351 So.2d at 1341; see also *West*, 891 So.2d 213 ("Substantively, the terms of the property settlement agreement are less than desirable, but we cannot say that no spouse in her or her right mind would agree to what is, at worst, a begrudging but generous offer...to provide alimony..."). Unconscionability looks at the terms of the contract. See *West*, 891 So.2d at 213. Unconscionability also looks at the circumstances existing at the time the contract was made. *Vicksburg Partners, L.P. v. Stephens*, 911 So.2d 507, 517 (Miss. 2005), overruled on other grounds by *Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So.3d 695 (Miss. 2009). The Court in *Sanderson* held that substantive conscionability "feasibly could be measured at the time the

9

Case: 37CH1:15-cv-00634-CS    Document #: 91    Filed: 12/12/2019    Page 9 of 32
Case: 24CI2:21-cv-00002    Document #: 1    Filed: 01/04/2021    Page 37 of 60

prenuptial agreement is made; measuring it at the time the agreement is made would maintain consistency in the law. It would also ensure that the Court does not "relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated." *Mabus*, 890 So.2d at 819 (quoting *Estate of Hensley*, 524 So.2d at 328)."

At the time that the Bowmans executed their antenuptial agreement, Dave reported approximately $3,188,456.00 in assets owned prior to the marriage and Robin reported approximately $1,378,000.00 in assets owned prior to the marriage. Although there is a disparity in the amount of assets each party owned prior to the marriage which could result in a different outcome should said assets be subject to an equitable division under the *Ferguson* factors, this court finds that the antenuptial agreement is valid and enforceable, and as such, shall control the distribution of assets. It would be exceptionally difficult for the Court to determine the equitable division of property should the antenuptial agreement not apply as it took a forensic accountant several months to track the assets of the parties during the marriage. Further, neither counsel provided documentation that outlined, with specificity, that tracked the assets under the principles of equitable distribution as compared to the distribution per the provisions of the antenuptial agreement. Further, there is no indication that the terms of the antenuptial agreement were overly burdensome and to ensure that the Court does not "relieve a party to a freely negotiated contract of the burdens of a provision" as cited in *Mabus*, the Court finds that the antenuptial agreement is not substantively unconscionable.

### Assets of the Parties

Dave was disabled coming into the marriage and did not work. His income was derived from disability payments, severance pay, and unemployment. He did, however, have significant liquid assets, as evidenced by his property schedule attached to the antenuptial agreement. Robin

10

is employed as an attorney and works with the Social Security Administration. She too had assets prior to the marriage as per the antenuptial agreement property schedule.

Prior to their marriage, the parties created a LLC named Rainbow Ventures (hereinafter referred to as "Rainbow"). This entity was created on November 21, 2011. According to Dave, Rainbow was a "payment processing" business created to handle transactions relating to the parties' business of buying and selling properties for profit – or "flipping" properties – as well as buying and leasing properties.

Dave prays for reimbursement of the nonmarital monies he used to buy and/or refinance the properties at issue, or alternatively, to solely retain any of the properties he purchased that have not yet been sold. He also seeks his equitable share of money Robin earned during the marriage and his share of the increase in her retirement accounts that occurred during the marriage. In addition, he requests his share of the appreciation of the marital home located on Acadian Circle. Finally, he requests that he solely retains his tax carryover loss.

Robin prays for an equitable division of all of the proceeds from the family business, Rainbow, which are being held in the registry of this Court. She also seeks to retain all of the income she earned during the marriage and prays that the increase in her retirement accounts are deemed by this Court to be nonmarital, per the antenuptial agreement. She requests sole use and possession of the marital home on Acadian Circle with no distribution of the appreciation of value of that property to Dave.

Although both parties signed the antenuptial agreement, both parties are now challenging the exclusivity of certain items of property listed in the agreement. And although the antenuptial agreement states that commingling would not apply, both parties now argue that certain properties initially listed as nonmarital, should be reclassified as martial property due to commingling.

11

Page three (3) of the antenuptial agreement states that "property and debts acquired in exchange for property listed on Schedules 'A' or 'B'...shall remain nonmarital." However, according to provision four (4) on page five (5) of the antenuptial agreement, property acquired during the marriage that is jointly-titled shall be deemed marital property, regardless of how acquired. These provisions are contradicting clauses.

Page nine (9) of the antenuptial agreement contains an additional contradiction. It states that "in determining the consideration provided by each party whenever required for a division of property hereunder, the presumption contained under Mississippi common law, or any statute herein enacted, that all property acquired by either party during the marriage is marital property, shall not apply; and further provided that the doctrine that nonmarital property may become marital property by commingling shall not apply." However, although convoluted, the antenuptial agreement is both procedurally conscionable and substantively conscionable and the terms of the agreement shall govern the distribution of property.

**The Rainbow Ventures, LLC Operating Agreement:** Rainbow Ventures, LLC has two members: Robin and Dave. Robin serves as the Registered Agent. Per page two (2) of the Operating Agreement (Ex. 5A) any distributions and withdrawals were to be approved by both members. On page four (4), in contradictory fashion, the Operating Agreement stated that any decision regarding loans must have unanimous consent of the members under part a, but under part b, any financial decision (which would also include loans) greater than $1,500.00, requires a lesser than unanimous consent of "50% or more consent of all members."

At the hearing, evidence was presented by both parties regarding violation of the Rainbow Operating Agreement. Robin testified that Dave withdrew money without the necessary written approval. Dave testified that Robin never paid the initial $25,000.00 capital requirement. These

12

Case: 37CH1:15-cv-00634-CS   Document #: 91   Filed: 12/12/2019   Page 12 of 32
Case: 24CI2:21-cv-00002   Document #: 1   Filed: 01/04/2021   Page 40 of 60

issues are moot, as the Operating Agreement requires arbitration as the sole means of dispute resolution for the members, which was never done.

**The Expert Report:** The parties hired an expert to trace all monies that came into the marriage, as it compares to the nonmarital schedules each party submitted with the antenuptial agreement. Most of the transactional activities were accounted for in the Report. Neither party objected to the expert nor his Report.

### The Law on Money and Property in Divorce
### A Process for Orderly and Fair Separation

Regarding property which is not listed as a separate asset in the antenuptial agreement, an equitable division is necessary. Cases governing division of property and monetary obligations in divorce begin with *Hemsley v. Hemsley*, 639 So.2d 909 (Miss. 1994), *Ferguson v. Ferguson*, 639 So.2d 921 (Miss. 1994), *Armstrong v. Armstrong* 618 So.2d 1278 (Miss. 1993), and *Cheatham v. Cheatham*, 537 So.2d 435 (Miss. 1988).

*Hemsley* directs division of property into two classes, marital and separate. The remaining three cases deal with money issues in division of the marital property and determination of alimony in context of that division, with some attention given to separate property, if any, setting out specific requirements for courts in mandated opinions, such as this one, where money issues are considered in marital dissolution cases. More recent decisions expand and develop application of the concepts and "factors" first set out in the *Ferguson, Armstrong* and *Cheatham* cases, which are now followed and required to be discussed in some detail, if applicable, as a matter of course under mandate of the Supreme Court.

The four cases cited have established a process for filtering and analyzing evidence in order to make an orderly and fair separation of the financial and property-related entanglements between divorcing spouses. A case specifically citing the three "factor" cases of *Ferguson,*

13

*Armstrong* and *Cheatham* by the Court of Appeals is *Meador v. Meador*, 44 So.3d 411 (Miss. Ct. App. 2010). See also *Yelverton v. Yelverton*, 961 So.2d 19 (Miss. 2007).

### STEP ONE - The *Hemsley* determinations

"Marital Property" is, presumptively, any property acquired by married partners during their marriage, no matter how paid for or in whose name it may be titled. It is that property which is "equitably divided" by a Court when the marriage that produced the property is at an end.

"Separate property," is "nonmarital" property, e.g., property not subject to equitable division. It specifically includes property acquired by either gift or inheritance. In recent cases, separate property has been determined to also include property acquired after separation, if accomplished through effort and not purchased with marital assets, and if done so after entry of a Court Order for Separate Maintenance or an Order for "Temporary Features" in a pending divorce action. In the case at hand, the Court considers the items listed in the schedule of property attached to the antenuptial agreement to be nonmarital property based upon the agreement of the parties.

The concept underlying the *Hemsley* determinations is that property acquired through effort of either or both spouses during their marriage, or given to them jointly, as opposed to property that inures to a spouse by gift, inheritance, or otherwise through no effort of either of the spouses, such as normal market appreciation, is that which should be divided - equitably - and apportioned to each of them when their marriage fails.

### STEP TWO - The *Ferguson* based "Equitable Division" process

It is initially assumed by the law that, once a *Hemsley* analysis has characterized and defined the marital estate of divorcing spouses, the marital estate subject to division has been produced as the result of equal contribution of both spouses, whether that contribution is financial or in uncompensated efforts supportive of the ends of the marriage.

14

A long marriage, in itself, is a fact supportive of a finding of equal effort of the partners as well as one specifically included in those enunciated cases in which alimony is an issue.

Next, it becomes necessary to consider the factors set out in *Ferguson*, one at a time, to decide whether the initial presumption should change from equal to unequal, and if so, to what extent.

The factors set out in *Ferguson* which must be considered in equitable division of marital property are:

1. Substantial contribution to the accumulation of the property, to include:
   a. direct or indirect economic contribution, and/or
   b. contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage, and/or
   c. contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets

2. The degree to which each spouse has expended, withdrawn, or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise;

3. The market value and emotional value of the assets subject to distribution;
4. The value of the assets not ordinarily, absent equitable factors to the contrary, subject to distribution, such as property brought to the marriage by the parties and the property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income, and earning capacity; and

8. Any other factors, which in equity, should be considered.

*Ferguson v. Ferguson*, 639 So.2d 921 (Miss. 1994).

15

Case: 37CH1:15-cv-00634-CS    Document #: 91    Filed: 12/12/2019    Page 15 of 32
Case: 24CI2:21-cv-00002    Document #: 1    Filed: 01/04/2021    Page 43 of 60

**STEP THREE** - The *Armstrong* alimony decisions -

which may require reconsideration of Step Two or even Step One

In *Armstrong*, supra, the Court prescribed specific factors which must be considered when issues of "periodic" or "permanent" alimony are raised (terms used interchangeably . . . also applied to issues of "rehabilitative" alimony). The factors listed in *Armstrong* are as follows:

1. The income and expenses of the parties;

2. The health and earnings capacity of the parties;

3. The needs of each party;

4. The obligations and assets of each party;

5. The length of the marriage;

6. The presence or absence of minor children in the home, which may require that one or both parties pay, or personally provide child care;

7. The age of the parties;

8. The standard of living of the parties, both during the marriage and at the time of the support determination;

9. The tax consequences of the spousal support order;

10. Fault or misconduct;

11. Wasteful dissipation of assets by either party; or

12. Any other factor deemed by the Court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong v. Armstrong*, 618 So.2d 1278 (Miss. 1993).

**STEP FOUR** - The *Cheatham* determinations -

may adjust decisions made in Steps One, Two and Three

In addition to the *Armstrong* factors, applicable to historically recognized "regular periodic" alimony, usually payable monthly until remarriage or death of one or the other of the parties, in *Cheatham v. Cheatham*, 537 So.2d 435 (Miss. 1988) the Court set out four [4] additional factors to be considered in determining whether an award of lump sum alimony, payable in one payment or in installments, might be appropriate instead of the *Armstrong* "periodic or traditional"

16

monthly payment of alimony. Those factors also might support an award of "rehabilitative" alimony, allowing expired educational credentials required for employment to be regained, or new skills and qualifications to be obtained by a spouse who has not been recently active in employment outside the home. They are:

1. Substantial contribution to the accumulation of the payor's total wealth by quitting work to become a homemaker or assisting in the spouse's business;

2. A long marriage;

3. The recipient spouse has no separate income, or the separate estate is meager by comparison;

4. The recipient spouse would lack financial security without the lump-sum award.

Cheatham v. Cheatham, 537 So.2d 435 (Miss. 1988).

The above factors will be applied to the specific items of marital property subject to equitable distribution as discussed below.

### Bank Accounts

EverBank: During the marriage, the parties had two joint accounts with EverBank, a checking account (ending in 5980) and a savings account (ending in 5079). According to the report, the balance in the joint checking account, as of September 30, 2017, was $1,005.02. The remaining balance is to be split evenly between the parties. The remaining balance of the savings account, as of September 30, 2017, was $79,282.83. The report prepared by Koerber indicated that unidentified deposits and deposits from the checking account represented approximately eighty-four percent (84%) of the total deposits to this account (the savings account). Under Ferguson, it is impossible to determine which, if either, party had a more active role in the contribution to the accumulation of the balance of that account. There was no evidence presented that either spouse had disposed of the funds in the account. Likewise, there was no evidence presented that the

17

balance of this account was premarital property as it was a business operating account. As such, the Court finds this account is marital property and that an equal division of the remaining balance is appropriate with Robin to receive fifty percent of the account balance and Dave to receive fifty percent of the account balance.

**Incredible Bank (River Valley Bank)**: This joint account (ending in 0072) was primarily utilized for transactions to and from the other joint accounts, as per Koerber report. The account balance as of September 30, 2017 was $5,412.52. As per the *Ferguson* analysis above, both parties contributed to this account, and as such, is marital property and is subject to equitable division. As such, this account balance is also to be split evenly between the parties.

**The Rainbow Accounts**: There were three bank accounts for Rainbow Ventures, LLC. The First Bank account (ending in 2686) had a balance of $1,773.73 as of September 30, 2017. Considering the same *Ferguson* analysis as applied to the other joint accounts, the parties will split the balance of this account and the other two bank accounts under the name of Rainbow Ventures, LLC, after any and all remaining obligations and liabilities of Rainbow have been satisfied, if any exist. The parties shall execute any and all paperwork necessary to dissolve the Rainbow entity within ninety (90) days of the date of this *Opinion*. The First Bank account (ending in 2751) had a balance of $4,531.00 as of September 30, 2017. The parties will split the balance of this account after any and all remaining obligations and liabilities of Rainbow have been satisfied, if any exist. The B of I Federal bank account (ending in 9944) had a balance of $68,380.64 as of September 30, 2017. The parties will split the balance of this account after any and all remaining obligations and liabilities of Rainbow have been satisfied, if any exist.

18

## The Properties

**40 Acadian Circle**: This property was Robin's home prior to the marriage and is listed on her schedule of property in the antenuptial agreement. She purchased the home in 2009. The parties lived at this home during their marriage. According to the report by Koerber, the property was purchased by Robin for $275,000.00. In June 2012, the parties began to pay the mortgage from their joint bank account. The report indicates that approximately $75,000.00 was paid towards the mortgage from the parties' joint bank account from June 2012 until October 2015. During this period, in February 2013, the property was refinanced. Per Koerber's report, $15,103.13 was paid at the refinancing closing. According to Dave, this was to decrease the amount of the mortgage balance so that mortgage insurance would not be required. In a quitclaim deed filed the following month, Robin and Dave were listed as joint owners of the property.

Dave seeks to recover a portion of the monies he deposited into the joint bank accounts that were used on this property from June 2012 through October 2015. He stated that he paid for improvements on the home as well. However, the antenuptial agreement clearly states that commingling will not convert a nonmarital asset to a marital asset. When Dave deposited funds into the joint bank account, he commingled his nonmarital funds, and those funds cannot be used to convert the property (40 Acadian Circle) into a marital asset. Although the property was jointly titled in 2013, the asset remains a nonmarital asset. Per the antenuptial agreement, only property acquired after the marriage and jointly titled is marital property, not properties that were included on the parties' respective schedules in the antenuptial agreement.

19

As a nonmarital asset, the value of the property, including any improvements thereon, are not subject to equitable distribution.[2] For the foregoing reasons, the Court finds that Robin retains sole ownership and possession of the property located at 40 Acadian Circle as a nonmarital asset.

**22 Carriage Park Drive:** This property was included in Robin's schedule of property in the antenuptial agreement. It was a rental property that she owned prior to the marriage. It is undisputed that Dave paid off the original mortgage with Grand Bank in the amount of $199,565.11. The payments were wired directly from Dave's separate accounts to Grand Bank. The funds were not commingled with the parties' joint bank accounts. After the mortgage payoff, Robin began making payments to Dave in the amount of $841.37, as evidenced by the checks admitted as Ex. 7G.[3] These payments were made from March 5, 2013, until May 8, 2017. According to Koerber's report, as of May 2017, the balance of the loan was $180,962.02 and additional documents regarding a more current balance were not provided. There is a dispute as to whether an enforceable promissory note exists between the parties on this property. The Court admitted a copy of a promissory note as Exhibit 7A despite the objection of counsel pursuant to the best evidence rule in that an original was not produced. Robin disputed signing the promissory note but did admit that there was an oral agreement to repay Dave. Correspondence between the parties (Ex. 14 and Ex. 15) also establish that an agreement existed between the parties.

The property was sold in May 2017 and the proceeds went into and remain in Robin's Regions checking account. The Court notes that the proceeds from the sale were $194,580.56. Accordingly, the Court finds that Robin shall reimburse Dave $180,962.02 for his payoff of the

---

[2] The Antenuptial Agreement allows for an increase in nonmarital asset value (Acadian Circle) via contributions of marital property (the joint bank account) by agreement (payments were joint).
[3] The Court notes that there were forty payments made in the amount of $841.37, nine payments made in the amount of $843.21, one payment made in the amount of $828.67, and one payment made in the amount of $844.37.

20

mortgage and she shall retain the remaining $13,618.54,[4] Dave prays for outstanding interest in the amount of more than $40,000.00. However, since the validity of the note is disputed, the terms of the note and additional interest will not be considered by the Court.

**60 Harvest Circle:** According to Koerber's report, this property was purchased by Rainbow in July 2015 for $79,000.00. The funds from this purchase were taken from the parties' Incredible Bank Account (ending in 0072).[5] Per Koerber's report, the Incredible Bank account was primarily funded by the parties' joint EverBank accounts (ending in 5079 and 5980). This particular property was obtained after the marriage, and although not jointly titled to the parties, it was titled to Rainbow which is jointly owned by the parties. The property was sold in November 2016. The proceeds from the sale of this property, totaling $131,814.14, were placed in the registry of this Court by Order dated August 23, 2018 (MEC Document # 69).

Dave testified that he intended to be reimbursed for the purchase price of this home as he indicated by an unsigned promissory note between him and Rainbow. However, according to the Rainbow Operating Agreement, any loan required unanimous approval by the members. Robin stated that she did not approve any such loan. Additionally, even though the parties agreed that commingling did not apply per the antenuptial agreement, to reimburse Dave the amount of the purchase price would ignore Robin's contributions to the bank account used to purchase said property. Accordingly, the Court finds this property to be marital property as it was purchased during the marriage using funds from the parties' joint bank account and named in the business of the parties, who are equal owners. Both parties testified that they were involved in property walk-throughs, realtor meetings, renovations, and cleanings, showing that both contributed to the

---

[4] The Court does not consider the $13,618.54 an increase in value subject to distribution since the refinanced amount of $199,565.11 was greater than the sales price of $194,580.56.
[5] This account is also referred to as the River Valley Bank account.

21

accumulation of the property under *Ferguson*. Further, Dave testified that he handled the paperwork for the business and Robin helped set up the property and with painting and other tasks. Therefore, it is appropriate under *Ferguson* to equally divide the Court registry funds from the sale of the property between the parties. Each party shall receive $65,907.07.

**42 Bridgewater:** This property was purchased for $191,500.00 during the marriage on September 17, 2012. The property was jointly titled to both parties. Koerber's report indicated that the money used to purchase the property was wired to First American Title Insurance Company from one of Dave's separate accounts. An executed promissory note between Dave and Rainbow dated September 14, 2012, in the amount of $187,668.03 indicated that the Bridgewater property would serve as collateral under the note.[6]

Robin disputes her signature on the promissory note. She claimed that the promissory note is not valid since Dave and Rainbow (listed as the borrower on the note) were the only two parties on the note. Rainbow did not own the property, which was titled to the parties. The funds used to purchase the property did not come from the Rainbow operating account.

The Court finds, per the antenuptial agreement, that this property is marital property as it was acquired during the marriage and jointly titled to the parties. The property subsequently sold on April 16, 2013 and the proceeds ($263,935.75) were deposited into the joint EverBank account (ending in 5079). The profit from the sale was $72,435.75. Per Koerber's report, a portion of the proceeds from the sale of the Bridgewater property were used to purchase 35 Clipper Drive, discussed below.

A *Ferguson* analysis renders Dave as the instrumental party in the contribution and accumulation of the Bridgewater property. Dave testified that he found the property during his

---

[6] A copy of the promissory note was admitted as Ex. 10C and was objected to by counsel for Robin under the best evidence rule in that the original was not provided.

22

Case: 37CH1:15-cv-00634-CS    Document #: 91    Filed: 12/12/2019    Page 22 of 32
Case: 24CI2:21-cv-00002    Document #: 1    Filed: 01/04/2021    Page 50 of 60

search of local foreclosures. He also wired the money for the purchase price from his personal bank account. Robin did not contribute financially to the initial purchase of the property, although she did help clean up and repair the property. As such, the Court finds that Dave is entitled to a majority of the profit from the sale of the Bridgewater property. The Court also finds that Dave paid himself in full for his majority share of the profit when he transferred $60,379.24 from the EverBank account (ending in 5079) to his personal account after the Bridgewater property sold on April 29, 2013.[7] Since this property has sold and the money has already been disbursed, there will be no further division of equity relating to this property by the Court.

**35 Clipper Drive:** This property was purchased during the marriage on April 23, 2013, for $130,500.00. The funds used to purchase the property came from the joint EverBank account (ending in 5079) and the property was jointly titled to the parties. Per the antenuptial agreement, the Court finds this property is marital property.

Under *Ferguson*, Dave was primarily responsible for the initial acquisition of this property. Once the Bridgewater property sold (paid for from Dave's personal account), the proceeds increased the EverBank account balance to an amount sufficient to purchase the property on Clipper Drive. The parties then rented the property for some period of time. It is currently vacant.

The Court finds that this property will be listed and sold immediately. The property was purchased for $130,500.00 and in 2017 was appraised for $189,900.00. The parties, with the assistance of counsel, shall list the property, with terms including price, listing broker, and any improvements to be made thereto to be agreed to by the parties. If there is not an agreement between the parties within thirty (30) days of the date of this *Opinion*, the property will be listed

---

[7] Per Koerber's report, Dave transferred this amount in partial payoff of the Bridgewater promissory note, of which Dave and Rainbow were parties. The Court, however, finds the note invalid. Rainbow was listed as the borrower, but as previously discussed, the funds were transferred directly from Dave's personal account to First American. Rainbow was neither a party to the transaction nor an owner of the property.

23

and sold "as is" with Debra Pace of RE/MAX Real Estate Partners, who has previously assisted the parties with real estate purchases. The parties will split any costs of agreed improvements, losses, and/or sales proceeds equally.[8]

**101 North 22nd Avenue:** This property was purchased during the marriage for $80,000.00. The funds used to purchase the property were wired directly to the closing attorney from Dave's personal EverBank account. The property was jointly titled to the parties. Per the antenuptial agreement, the Court finds this property to be marital property. The property was renovated, leased out for twelve (12) months and then sold on August 13, 2015, for $135,000.00. The proceeds were deposited into the registry of this Court as evidenced in MEC Document # 70.

With an application of *Ferguson*, Dave was primarily responsible for the initial contribution and acquisition of this property. Once purchased, the parties renovated, leased, and sold the property. Koerber's report indicated that Dave received principal and interest payments on this property during the ownership. Robin testified that she did not receive any rental income. As the funds used to purchase were from Dave's separate bank account, the Court finds he is awarded $70,000.00 for his initial contribution to the purchase of the property. The remaining balance of $48,737.22 is to be split between the parties. Dave will receive a total of $94,368.61 and Robin will receive $24,368.61 from the registry of the Court.

**112 Cameron #101:** This mobile home was purchased during the marriage for $3,000.00 on October 8, 2014. It was jointly titled to the parties, and the funds used to purchase were paid from the joint EverBank account (ending in 5980). According to the parties, another couple are

---

[8] Dave claims to be owed the original purchase price pursuant to a promissory note. The Court rejects said claim and notes that Dave repaid himself $60,379.24 per page 14 of the report, without Robin's knowledge, which would have violated the terms of a valid promissory note, the prenup, and the Rainbow operating agreement. The report also indicates that he received additional principal and interest payments on this property during the time this property was rented. Robin testified that she did not receive any rental monies.

24

now co-owners with Dave and Robin. Dave testified that the property is vacant and that he could not maintain the property due to his relocation to Arizona. Neither party expressed an interest in retaining the property. Per the antenuptial agreement, the property is marital. The Court finds that the parties will sell their interest to the other co-owners and split the proceeds evenly.

## Other Distributions

**Credit Cards:** According to Koerber's report, the parties opened credit accounts for Rainbow with American Express and Chase. No balances were included in the report. Any outstanding balance on either credit card shall be split evenly by the parties. If not already closed, these accounts shall be closed immediately.

**The Mercedes Benz C300:** This vehicle was purchased during the marriage and jointly titled. Therefore, per the antenuptial agreement, this should be classified as marital property. Per Koerber's report and testimony from the parties, the current value of the vehicle is disputed. Robin also testified that the vehicle is currently in a repair shop and is inoperable. Both parties own and operate other vehicles according to their 8.05 financial declarations. Neither party expressed an interest in retaining the vehicle. Therefore, since the vehicle is in a local repair shop, Robin shall be responsible for overseeing the repair and sale of the vehicle. The asking price shall be the fair market value of the vehicle, per Kelley Blue Book. The cost of repair and the proceeds from the sale of the vehicle shall be split equally between the parties.

**Tax Refunds:** The antenuptial agreement addresses Dave's tax loss carryover. Koerber's report analyzed the tax refunds received by the parties from 2012 to 2015. Dave testified that he believes he is entitled to a greater amount of the remaining funds to be distributed in this case due to his tax loss carryover being the primary reason for the refunds. However, the antenuptial agreement expressly states that Robin shall enjoy the benefits of the carryover while the parties

25

Case: 37CH1:15-cv-00634-CS    Document #: 91    Filed: 12/12/2019    Page 25 of 32
Case: 24CI2:21-cv-00002    Document #: 1    Filed: 01/04/2021    Page 53 of 60

are married and filing joint returns. The carryover benefit reverts back to nonmarital property only after separation. The parties separated on August 13, 2015. The tax refunds from the date of marriage until August 13, 2015 were therefore marital property. However, as the last tax refund per Koerber's report was four (4) years ago, and there was no additional proof or evidence offered that any of refunds remain, this issue is moot in that there are no funds to distribute.[9]

**Robin's Income:** During the marriage, Robin made deposits of her bi-weekly salary into the EverBank joint account (ending in 5980). However, according to Koerber's report, Robin also deposited a portion of her salary into other accounts. One such account was her Regions Bank account (ending in 5238). The total amount of deposits from 2012 to 2015 was approximately $67,982.07. Dave argued that this amount is marital property and he is entitled to an equitable portion. However, as previously discussed, the antenuptial agreement states that "the presumption contained under Mississippi common law, or any statute hereinafter enacted, that all property acquired by either party during the marriage is marital property, shall not apply; and further provided that the doctrine that nonmarital property may become marital property by commingling shall not apply."

In completing an equitable division of marital property, Dave has been awarded a higher percentage of the available funds to be distributed to the parties. His higher percentage is a result of this Court adhering to the antenuptial agreement and the intent of the parties therein. To classify a portion of Robin's income as marital property is not equitable and is not in line with the language of the antenuptial agreement. Ex. 7A shows that Dave received interest payments on a portion of the nonmarital funds that he loaned during the marriage to purchase properties. This interest is nonmarital income to Dave. Robin also repaid Dave monthly from her personal Regions Bank

---

[9] The tax refunds were deposited into the parties' joint bank account which have been equitably distributed herein.

account as evidenced in Ex. 7G. This monthly payment was also income to Dave during the marriage and could be deemed marital and subject to an equitable distribution as well. The Court finds, however, that neither Robin's income deposited into her Regions Bank account nor the income Dave made on his investments during the marriage are marital property.

**Robin's Retirement Accounts:** Robin deposited a portion of her income into a Thrift Savings Plan, a Roth Thrift Savings Plan, and the Federal Employee Retirement System. Dave prays for an equitable distribution of the amount of appreciation of these accounts during the marriage. The Court finds that any appreciation to her retirement accounts is nonmarital property per the antenuptial agreement. Robin specifically listed those retirements accounts on her separate property statement and these items are to remain nonmarital property. From an equitable standpoint, there was testimony that some of the money at issue was for the benefit of Robin's daughter and an examination of the assets listed by the parties in their respective financial disclosures shows that Dave has substantially more assets than Robin. To allow Dave's substantial nonmarital investments to appreciate in value during the marriage without interruption but then to split the small appreciation of Robin's nonmarital investments would be inequitable.[10]

**The Cigna Repayment:** There was a repayment to Cigna from the EverBank joint account (ending in 5980). The repayment was for Dave's long-term disability, per Koerber's report. Dave testified that he is entitled to half of the repayment in the form of an equitable distribution. However, Dave also testified that all of his benefits from his previous work history, including disability benefits, were a result of employment prior to the marriage and therefore nonmarital property. Consequently, the Court finds that this debt involving Dave's long-term disability is

---

[10] The Court acknowledges that the antenuptial agreement only allows for an increase in value of non-marital property from a contribution of marital property only by agreement; but a finding that the contributions herein (Robin's income) were non-marital renders this clause of the agreement inapplicable.

27

Case: 37CH1:15-cv-00634-CS    Document #: 91    Filed: 12/12/2019    Page 27 of 32
Case: 24CI2:21-cv-00002    Document #: 1    Filed: 01/04/2021    Page 55 of 60

associated with his nonmarital benefits and therefore is nonmarital and not subject to reimbursement. The Court also notes that the repayment was from the parties' joint bank account, to which Robin contributed to on a regular basis.

**Attorney's Fees and Expert Fees:** Robin challenged the validity of the antenuptial agreement and did not prevail. The antenuptial agreement expressly states on page seven (7) subsection (c)(iv) that if one party challenges the validity of the antenuptial agreement, "the challenging party, if unsuccessful in that challenge, shall be solely responsible for their own attorneys fees and costs of court, as well as responsible for the like fees and costs incurred by the non-challenging party." The Court found the antenuptial agreement to be valid and held the issue of attorney fees in abeyance until a hearing on the merits. The Court has also reviewed and considered the reasonableness and necessity of the attorney's fees requested by Dave against Robin for her challenge of the antenuptial agreement. The Court finds that Dave's reasonable attorney fees were incurred as a direct result of Robin's challenge of the antenuptial agreement and per the terms of the agreement, she is to be held responsible for the "fees and costs incurred by the non-challenging party." Having considered Defendant's Exhibit 24 itemized attorney fee statement showing total charges and expenses of $6,983.58 the Court finds that the charges and hourly rate is in keeping with fees and charges customarily charged in the 10th District Chancery Court; that said time, fees, and expenses were reasonably necessary; and that the sum of $6,983.58 is reasonable and appropriate to be paid by Robin to Dave as attorney's fees. Robin shall pay the sum of $6,983.58 within sixty (60) days from the date of filing of this *Opinion*. Dave shall have judgment against Robin for this amount plus interest at 4% per annum thereafter if not paid as ordered and for all of which let execution and other proper process issue.

The fee invoice for Koerber was submitted separately by agreement of the parties at trial. There is an outstanding balance due of $9,410.00. Dave testified that he paid more of the initial payment to Koerber than Robin did, but the record shows the initial payment was paid from the funds being held in the Court registry, which are marital funds. The Court therefore finds that each party is responsible for paying half of the remaining expert fee, which will be paid out of the funds held in the registry of this Court.

**Funds Held in the Registry of the Court:** There were two deposits made into the registry of the Court, one in the amount of $131,814.14 and one in the amount of $118,737.22 for a total of $250,551.36. By Order of this Court, Koerber was paid $25,000.00 on November 29, 2018 for their work in the case, leaving a balance of $225,551.36. At the trial, an additional invoice in the amount of $9,410.00 was submitted by Koerber. The Court has ordered that this invoice is to be paid from the funds of the registry of the Court (with each party being responsible for one half of the payment, or $4,705.00), leaving a balance of $216,141.36 in the registry of the Court.

Based on the above discussion as to the *Ferguson* factors, the presentations of counsel, and other observations on the behavior and demeanor of the parties on and off the witness stand, the Court finds that the major items of marital property should be resolved as follows:

**Property/Assets Awarded to Dave**
Assets:
| | |
|---|---|
| 50% of EverBank Account 5980 | $502.51 |
| 50% of EverBank Account 5079 | $39,641.41 |
| 50% of Incredible Bank 0072 | $2,706.25 |
| 50% of First Bank 2686 | $886.86 |
| 50% of First Bank 2751 | $2,265.50 |
| 50% of B of I 9944 | $34,190.32 |
| 50% of proceeds from 60 Harvest Cir. | $48,702.07 |
| 50% of proceeds from sale of 35 Clipper Drive | $94,950[11] |
| Proceeds from sale of North 22nd Avenue Property | $94,368.61 |

---

[11] Based on appraised value of $189,900.00

29

| Total: | $318,213.53 |

**Debts/Liabilities:** No Marital Debts

**Property/Assets Awarded to Robin:**
Assets:

| 50% of EverBank Account 5980 | $502.51 |
| 50% of EverBank Account 5079 | $39,641.41 |
| 50% of Incredible Bank 0072 | $2,706.25 |
| 50% of First Bank 2686 | $886.86 |
| 50% of First Bank 2751 | $2,265.50 |
| 50% of B of J 9944 | $34,190.32 |
| 50% of proceeds from 60 Harvest Cir. | $48,702.07 |
| 50% of proceeds from sale of 35 Clipper Drive | $94,950[12] |
| Proceeds from sale of North 22nd Avenue Property | $24,368.61 |
| **Total:** | **$248,313.53** |

**Debts:** No Marital Debts

## Conclusion

Having considered the foregoing analysis, findings, and conclusions:

IT IS, THEREFORE, ORDERED AND ADJUDGED that the parties are granted a final divorce of and from each other on the ground of irreconcilable differences as recognized and defined in MCA § 93-5-2.

IT IS, FURTHER, ORDERED AND ADJUDGED that the antenuptial agreement is found to be both procedurally conscionable and substantively conscionable.

IT IS, FURTHER, ORDERED AND ADJUDGED that the real and personal property division set out above by the Court is made its order and adjudication and obligatory upon the parties under law. The parties are directed to accomplish the same within the time periods set out herein. All personal property in the possession of either party not awarded in the above equitable

---

[12] Based on appraised value of $189,900.00

30

Case: 37CH1:15-cv-00634-CS    Document #: 91    Filed: 12/12/2019    Page 30 of 32
Case: 24CI2:21-cv-00002    Document #: 1    Filed: 01/04/2021    Page 58 of 60

distribution is deemed to be the property of the party in possession free and clear from any claim of the other party;

IT IS, FURTHER, ORDERED AND ADJUDGED that Dave shall have exclusive use and benefit of his tax loss carryover effective the date of the separation.

IT IS, FURTHER, ORDERED AND ADJUDGED that the Chancery Clerk of Lamar County, Mississippi, is to make the following disbursements from the Registry of the Clerk: $9,410.00 to Koerber & Company, P.A. to satisfy their outstanding balance, $73,070.68 to Robin Sills Bowman, and $143,070.60 to David Bowman.

IT IS, FURTHER, ORDERED AND ADJUDGED that Robin shall pay Dave $187,945.60 within sixty (60) days of this *Opinion*.[13]

IT IS, FURTHER, ORDERED AND ADJUDGED that any and all other relief requested by the parties by way of pleadings, motions, or submissions filed or pending on the record at trial, not addressed and afforded herein, is deemed DENIED and prayers there for DISMISSED WITH PREJUDICE. To the extent allowed under the Federal Bankruptcy Code, all provisions of this Judgment shall be non-dischargeable in Federal Bankruptcy proceedings initiated by either party.

THE COURT FINDS, pursuant to Uniform Chancery Court Rules 4.02, 5.01 and 5.02 and MRCP 54, that there is no just reason for delay and that all issues raised between the parties have been adjudicated herein. The Court directs entry hereof by the Clerk as FINAL. This *Opinion And Final Judgment* is certified as a FINAL JUDGMENT per MRCP 54 and is subject to appeal.

NOTICE OF THE FILING of this *Opinion And Final Judgment*, together with a filed copy hereof, shall be transmitted by the Clerk of the Court to counsel of record for the parties pursuant to MRCP 77(d).

---

[13] $180,962.02 for 22 Carriage Lane distribution and $6,983.58 for attorney fees.

SO ORDERED AND ADJUDGED on this the 12th day of December, 2019.

_____
M. CHADWICK SMITH, CHANCELLOR